THE STATE OF KANSAS v. WILLIAM HOFFMAN.

1. GRAND LARCENY — *Information.* An information for grand larceny describing the property taken as four head of "neat cattle" is sufficiently specific.

2. EVIDENCE — *Possession of Stolen Property.* The rule announced in the case of *The State v. Cassady,* 12 Kas. 550, "That the possession of stolen property recently after it is stolen is *prima facie* evidence of guilt, and, if unexplained, may be sufficient of itself to warrant a conviction," followed.

3. VERDICT, *Supported.* The evidence in the case examined, and *held* sufficient to support the verdict of guilty and the sentence pronounced thereon.

*Appeal from Chase District Court.*

PROSECUTION for grand larceny. From a conviction and sentence, the defendant, Hoffman, appeals. The opinion herein, filed July 6, 1894, states the material facts.

*Madden Bros.,* and *T. H. Grisham,* for appellant:

Although the evidence was circumstantial, it was incumbent on the state to make good out of the evidence, first, that the cattle found at Stanberry, Mo., were Julius Panzram's cattle; and second, that these cattle were shipped in defendant Hoffman's car, by him, with the intent to deprive the owner of them. These facts constituted the *corpus delicti,* and the state was required to prove them distinctly. Even had defendant made a confession of guilt, it would not have dispensed with their proof. Whar. Cr. Ev., §§ 632, 633.

In view of the general verdict of guilty, of course all the evidence must be construed in its most favorable light in favor of the state; but if there is an entire absence of evidence on any material fact necessary to be found, the evidence cannot receive a construction that would supply such a fact. See 1 Greenl. Ev., § 13; *The State v. Hoffman,* 16 Pac. Rep. 640; *Beach v. The State,* 11 S. W. Rep. 832.

The court erred in its instructions to the jury. At best,

possession of stolen property, recently after the fact, is but a fact among other facts in the case — a fact that should have only its natural effect on the minds of the jury along with the other facts. It is an argumentative fact on the evidence of a particular case, not a conclusive legal-bound fact, to have a particular force and effect of its own disconnected from the other facts, as is required by the rule as stated. We claim that the American system of restricting the court to respond to the law, and the jury to respond to the facts, so often upheld by this court, required a rejection of the rule as one of law. The latest, best and most eminent authorities are against it. See 2 Bish. Cr. Proc., §§ 743–745; *The State v. Smith*, 58 Ind. 340; 3 Greenl. Ev. 31; *The State v. Hodge*, 50 N. H. 510; *Conkright v. People*, 55 Ill. 204; *People v. Chambers*, 18 Cal. 382; *The State v. Hazard*, 12 Minn. 293; *Yates v. The State*, 33 Tex. 202; *The State v. Williams*, 2 Jones (N. C.), 194; *People v. Ah Ki*, 20 Cal. 177; *The State v. Reid*, 20 Iowa, 418; *People v. Grity*, 49 Cal. 581; *People v. Rodundo*, 44 id. 538. See, also, note in 1 Am. Cr. Rep. 575; *Stoner v. People*, 56 N. Y. 315.

We are aware that this court at an early day, in an abstract way, approved the rule as given by the trial court. *The State v. Cassady*, 12 Kas. 551. While this is true, we think, under the reason and the other authorities, the court should examine the question *de novo*. The Texas and New York cases (see *Lehman v. The State*, 18 Tex. App. 174; 51 Am. Rep. 298; *Stover v. People*, 56 N. Y., supra) cited by this court to sustain the position, in more recent decisions, as we understand their purport, overruled the former ones. But whether the rule be properly laid down or not with reference to an appropriate set of facts, the case in hand was not a proper case for its application. Instructions must be applicable to the issues. *Lorie v. Adams*, 51 Kas. 692; *Raper v. Blair*, 24 id. 374; *Railway Co. v. Peavey*, 29 id. 169.

Under all the authorities, the presumption that arises from the possession of stolen property is not to identify the property, but the theft. Bishop states the rule to be: "The

*corpus delicti,* or fact that the goods in question have been stolen, is a thing apart, to be proved, at least in general, by independent evidence. So that, before any presumption from the possession of the goods can be invoked, it must be otherwise shown that they have been stolen, the sphere of this presumption being, not to prove the theft, but to identify the theft." 2 Bish. Cr. Proc., § 739.

The issue in the case at bar was as to the identity of the cattle, not as to the identity of the individual. The *corpus delicti* was at issue, in the sense meant by Bishop in the above statement. This is an important and vital distinction, not to be misunderstood or misapprehended. The identity of the cattle found in Stanberry, Mo., as being Panzram's, and, if so, whether they were the same cattle that were shipped in defendant's car, were the real issues. These facts constituted the *corpus delicti,* in the sense of the authorities.

The instruction, coming in on the facts as presented, was calculated to cause the jury to believe that the cattle were Panzram's and not defendant's, because the burden of proof was on him to show that they were his cattle. This is the only way that the verdict can be reconciled with the evidence. See *The State v. Warden,* 8 S. W. Rep. 233.

Again, the instruction was not applicable, because the defendant proved affirmatively that he sustained a good character for honesty in the neighborhood in which he resided. This was undisputed by the state. *The State v. Casler,* 11 N. W. Rep. 918; 93 Mo. 242; 58 N. W. Rep. 906; see, also, *Ingalls v. The State,* 1 Crim. L. Mag. 476.

The information was defective. The informant seemed to have no definite idea of what to charge. This is shown by the variant manner of charging the defendant in two counts, and also by the very general phraseology of the information. The charge should have been more specific. Instead of charging the taking of "neat cattle," it should have charged the taking of steers. In charging, the specific name must be given, not the general. 2 Bish. Cr. Proc. 699, *et seq.* Besides, the term "neat" may mean not only the bovine species

of animals, but it has the quality meaning of "nice," or the weight meaning of "clean." Which one of these meanings was intended? The meaning should be clear from the face of the information. 2 Bish. Cr. Proc. 700.

*John T. Little*, attorney general, and *F. P. Cochran*, county attorney, for The State:

The first objection raised by the defendant (although not so expressed in words) is, that the verdict of the jury was not sustained by sufficient evidence.

Now, we submit that, if there was any testimony which, standing alone and uncontradicted, would, if believed by the jury, lead it to the conclusion reached by the verdict, supplying, either directly or from irresistible inference from other directly established facts, every link necessary to constitute a complete chain of such guilt as found by the verdict, then this court will not disturb the verdict, will not substitute itself for the jury, and weigh the credibility of the witnesses and the credence due the conflicting statements of the various witnesses who testified pro and con at the trial below, but will leave the finding of facts where it constitutionally belongs, with the jury. *The State v. McLain*, 43 Kas. 439; *Williams v. May*, 44 id. 179. Of course, if the jury was actuated by partiality or corruption, or was fraudulently imposed upon, its verdict can be set aside, and so can the findings and judgment of the court under like circumstances; so that detracts nothing from the solemnity due the verdict of the jury, fairly and honestly reached from the candid reasoning of their united minds brought to bear on the evidence before them.

The defendant's attorneys complain of the wrong done him by the court in giving the jury, among others, the following instruction, to wit:

"You are instructed that the possession of stolen property, recently after it has been stolen, throws upon the possessor the burden of explaining such possession, and, if unexplained, may be sufficient of itself to warrant the jury in convicting

the defendant of the crime of grand larceny. Of course, it must be so recent after the time of the larceny as to render it morally certain that the possession could not have changed hands since the larceny."

That this instruction was correct as a principle of law, has, as attorneys of the defendant admit, been decided by this court. See *The State v. Cassady*, 12 Kas. 559, *et seq.* Did the evidence in this case warrant the instruction? We submit that it did.

The defendant complains because the court did not further instruct the jury that, if an explanation was given by the defendant, it was incumbent on the state to prove it to be false or unreasonable. It seems to us that if anyone can complain of that instruction not having been given it is the state, and not the defendant, for, as the instruction now stands, if the defendant gave a satisfactory explanation he must be acquitted. Such an instruction at best only amounts to this, that after defendant offers his explanation, the state may introduce rebutting evidence, but this would not be necessary unless a satisfactory explanation were given — such an one as the state might fear the jury would believe unless it introduced further evidence in rebuttal, or explaining away defendant's explanation.

To say that because defendant had theretofore borne a good character would dispense with the necessity of any explanation, when caught with stolen goods in his possession, would be too foolish to talk about; and we submit that the court did give the jury the proper charge as to the weight to be given to the evidence of defendant's previous good character.

As to the sufficiency of the information, we let it speak for itself, without comment.

The opinion of the court was delivered by

HORTON, C. J.: The defendant was convicted of grand larceny and sentenced to the penitentiary of the state for the term of two years and six months. He appeals.

I. It is insisted that the information for grand larceny

was defective; that, instead of charging the taking of four head of "neat cattle," it should have charged the taking of four steers. In support of this, it is said that the term "neat" may mean "nice" or "clean." We think the description in the indictment sufficiently specific. "Neat cattle," in the statute describing the offense of grand larceny and in the information, does not mean "nice" or "clean." "Neat cattle" are animals of the genus *bos*, as distinct from horses, sheep, and goats. (Bish. Cr. Proc., § 700; *Johnson v. The State*, 1 Tex. App. 118; *Hubotter v. The State*, 23 id. 479; *The People v. Winter*, 9 Cal. 234.)

II. It is next insisted there was a total failure of proof that the defendant was guilty of the larceny charged in the information. In view of the general verdict of guilty, and the approval thereof by the trial court, all of the evidence must be considered in its most favorable light to support the conviction. We are of the opinion that the evidence was sufficient to justify the verdict and sentence.

It appears from the record that in June, 1893, Julius Panzram, living in Chase county, in this state, was the owner of four dehorned steers, all three-year-olds, and branded with a "Box P" on the left hip. One of them was a dun color, two were spotted, and one red. One of them had a hole in the ear. If any of the others had holes in their ears, Panzram had not noticed it. He bought them from a man named Schultz, marked as they were. He missed the cattle from his pasture, in Chase county, on the morning of June 26, 1893. The first part of July, 1893, he found all of them, except the dun steer, in the possession of Kygger & Liggett near Stanberry, Mo. He recognized his three cattle from some 20 other cattle in the pasture about 100 yards from them. He picked them out before he was close enough to see the brands, and requested Kygger, who was with him, to go and examine the cattle and ascertain if they were branded with " Box P" on the left hip as his were. Kygger made the examination and discovered that the three cattle claimed by Panzram were branded as he had described, and that they

45—53 KAS.

were dehorned. He also found that there were no other cattle in his yard with a similar brand. The defendant, who is a farmer, lived, in June, 1893, about six miles from where Panzram kept his cattle. He shipped 16 head of cattle in a car, on the night of June 28, 1893, from Cedar Grove, in Chase county, to Verner & Scroggins, a commission firm at Kansas City. The defendant testified there were nine cows and seven steers in his car. He accompanied the cattle to the stock yards at Kansas City, about 148 miles from Cedar Grove. After Panzram missed his cattle, he met the defendant in the road, and concerning such meeting and the conversation between them testified as follows:

"Ques. Did you have any words with him? Ans. Yes, sir.

"Q. State your conversation. A. Says I to the defendant, 'I understand you shipped some cattle?' He answered, 'Yes, sir.'

"Q. Had you then learned he had shipped some cattle? A. Yes, sir; I had learned that. Says I, 'How did you come out?' 'Oh, pretty good.' 'Make on it?' 'Yes, $27.50.' Says I, 'What did you ship?' 'Cows.' 'All cows?' 'Yes, all cows.' That was about all of the conversation."

The cattle shipped by Hoffman, which were not all cows, as he untruthfully informed Panzram, went to the stock yards in car No. 51010, and was the only car load of cattle he shipped to Verner & Scroggins within a year of that time. The car with the cattle reached Verner & Scroggins on the morning of June 29, 1893, and they were unloaded into pen 10, block 7, at the yards. Scroggins went wih Hoffman to the pen to see the cattle, and they talked about the price. Scroggins paid Hoffman for the cattle, partly in cash and partly by draft.

C. H. Hill was the salesman for Verner & Scroggins. He testified that Hoffman's cattle in the pen consisted of eight steers and eight cows, which would make one steer more and one cow less than Hoffman testified to. Hill sold the eight steers, part horned and part dehorned, on the 29th of June, 1893, to W. C. Trower, a cattle speculator, and Trower was

at pen 10 at the time he made his purchase. He kept the steers for several days, and then sold them to W. F. Moore, with the exception of the dun steer, which he kept a few days afterward, and then sold that animal with other cattle, but did not recollect where this lot went to. After Trower purchased the eight steers he moved them from pen 10 to pen 22, in block 24, of the stock yards. When Trower sold them to Moore they were in pen 22, and after Moore bought them he put them in pen 13, block 36, and then shipped them with other cattle to Kygger & Liggett, at Ravenswood, in Nodaway county, Missouri. Moore would not buy the dun steer from Trower. He testified "that three of the seven head he purchased were dehorned, were three-year-olds, were all branded alike on the hip of the left side, and that two of them were spotted and white, and one red." His description is identical with Panzram's, except that the latter was better acquainted with the brand of his own cattle. Moore also testified that none of the other cattle he shipped to Kygger & Liggett with the three he brought from Trower were, to the best of his opinion, branded. He seriously objected to the three he purchased on account of being branded. Kygger drove the cattle from Ravenswood to his pasture near Stanberry, where Panzram identified his three steers.

The jury were the judges of the credibility of the witnesses, and also of the weight of the evidence. If the evidence of the state is to be believed, four steers were stolen from Julius Panzram, about June 26, 1893. Three of them were found, and fully identified by him, near Stanberry, Mo., in the early part of July, 1893. These cattle, according to the evidence of the state, are the same the defendant shipped and sold to Verner & Scroggins at the stock yards at Kansas City, which were subsequently shipped to Kygger & Liggett. Hoffman was with the cattle in pen 10, block 7, at the stock yards in Kansas City, both with Scroggins and Hill, who sold the cattle from the pen as Hoffman's cattle. The objection to the verdict, upon the ground that there was an entire absence of material facts necessary to be found for a

conviction, is not tenable. The evidence of the state, if believed, not only identified the subject-matter — the steers — but also identified the person in possession of the stolen cattle soon after they were stolen. There was also other evidence that the defendant was guilty.

III. It is further insisted that the trial court erred in instructing the jury, among other things, as follows:

"That the possession of stolen property, recently after it has been stolen, throws upon the possessor the burden of explaining such possession, and, if unexplained, may be sufficient of itself to warrant the jury in convicting the defendant of the crime of grand larceny. Of course, it must be so recent after the time of the larceny as to render it morally certain that the possession could not have changed hands since the larceny."

The defendant did not admit that he took the steers owned by Panzram innocently or by mistake. His evidence was a denial of any possession or knowledge of Panzram's steers. He claimed that the 16 head of cattle he shipped to Kansas City belonged to him, or members of his family. He made no pretense that any were purchased or obtained from Panzram. This case, therefore, differs from *The State v. Warden*, 8 S. W. Rep. (Mo.) 233, and many similar cases. Notwithstanding the conflict of the courts concerning the possession of stolen property, we see no good reason, in such a case as this for not adhering to the rule of *The State v. Cassady*, 12 Kas. 550. A similar instruction was approved in that case. In 1 Greenl. Ev. (15th ed.), § 34, it is stated "That possession of the fruits of crime recently after its commission is *prima facie* evidence of guilty possession; and, if unexplained either by direct evidence or by the attending circumstances, or by the character and habits of life of the possessor, or otherwise, it is taken as conclusive." The possession of the stolen cattle by the defendant was unexplained, either by direct evidence or by attending circumstances. All the other persons who had possession or anything to do with the stolen cattle, after they were missed by Panzram up to the time he found three

head of them near Stanberry, explained fully their possession, where they bought them, and what they paid for them.    The defendant relied upon proof of his good character, not upon any explanation of his possession, except his absolute denial thereof.    He offered evidence of his good character for honesty in the neighborhood where he resided.    That was a matter for the consideration of the jury.    The court so instructed them in the following language:

"The evidence of previous good character is competent evidence in favor of the party accused of a crime, as tending to show he would not be likely to commit the crime alleged against him, and in this case, if you believe from the evidence that, prior to the commission of the alleged crime, the defendant had always borne a good character for honesty and a law-abiding citizen among his acquaintances and in the neighborhood where he lived, then this is a fact proper to be considered by you, with all the other evidence in the case, in determining the question whether the witnesses who have testified to facts tending to criminate him have been mistaken, or have testified falsely or untruthfully; and if, after a proper consideration of all the evidence in the case, including that bearing upon his previous good character, you entertain any reasonable doubt of the defendant's guilt, then you should acquit him."

We have examined the other alleged errors, including the one for a new trial on account of newly-discovered evidence, but find nothing substantial in them, and, upon the whole record, the judgment of the district court will be affirmed.

All the Justices concurring.