THE STATE OF KANSAS, *ex rel. A. A. Godard, Attorney-general*, v. W. A. JOHNSON, J. C. POSTLETHWAITE, AND L. S. CRUM, *as Judges*, AND J. M. MICKEY, *as Clerk of the Court of Visitation of the State of Kansas.*

(No. 11,723.  60 Pac. 1068.)

COURT OF VISITATION—*Act Unconstitutional.*  Chapter 28 of the Laws of 1898 (Gen. Stat. 1899, §§ 5779–5820), entitled "An act creating a court of visitation, declaring its jurisdiction and powers, and providing for proceedings and procedure therein," is unconstitutional and void, for the reason that, in the powers conferred upon that tribunal, legislative, judicial and administrative functions are commingled and interwoven in a manner violative of the constitutional requirement that the three great departments of government be kept separate, and the powers and duties of each exercised independently of the others.

Original proceeding in mandamus.  Opinion filed May 5, 1900.  Writ denied.

STATEMENT.

ON the 8th day of February, 1900, the state solicitor filed with the clerk of the court of visitation an information based on the affidavit of J. W. Robison, praying said court of visitation to inquire into and find what are reasonable rates or charges for the shipment of cattle in this state between the several stations on the lines of road operated by the Atchison, Topeka & Santa Fe Railway Company, and especially between El Dorado, Kan., and Kansas City, Kan.; that a complete schedule of such rates or charges be made, and that said company be enjoined from demanding, charging or receiving any other or different rates or charges.  The material part of said information is as follows:

" That said The Atchison, Topeka & Santa Fe Railway Company is a railroad corporation incorporated and organized under the laws of the state of Kansas,

and is and for several years last past has been engaged as a common carrier in operating certain lines of railroad in said state, carrying freight and live stock between numerous points and stations therein, including the haul from El Dorado, Kan., to Kansas City, Kan.; that said complainant, J. W. Robison, is a citizen and resident of said state, and is an extensive shipper of cattle and has frequent occasion to make use of the facilities afforded for shipment over said railroad; and many other citizens and residents of this state are, and for a long time have been, engaged in the business of feeding and shipping cattle, and are interested, in common with said complainant, in the rates charged by the railroads, including the lines of road operated by said The Atchison, Topeka & Santa Fe Railway Company, for such shipments.

"That previous to December 1, 1899, said railway company charged for the shipment of cattle a certain rate per car-load, which rate, as it concerned and affected said complainant, was thirty-six and $\frac{20}{100}$ ($36.20) dollars per car, thirty-six feet in length, from El Dorado to Kansas City, Kan., and that such rate or charge gave to said company a fair and reasonable compensation for the services performed; that in disregard of the rights of said complainant and other shippers of cattle, said company, on or about December 1, 1899, put in and promulgated a new and greatly increased rate for all such shipments of cattle, and asked and demanded therefor a charge that was and is unreasonable and unjust, and greatly in excess of what a reasonable charge should be for such service; that the new rate or charge is partially based upon weight, but is skilfully devised so as, as far as possible, to conceal the purpose to increase rates; that in the practical use and application of such new rate said company now exacts for a shipment of a car of cattle from El Dorado to Kansas City, Kan., about forty-two ($42) dollars per car, as against the charge of thirty-six and $\frac{20}{100}$ ($36.20) dollars per car, made prior to December 1, 1899; that a correspondingly increased rate has been put in force and is charged between all

other stations on the line of the road of said company in this state ; that such increase has been made, and such unjust and unreasonable rates are being demanded and exacted from the shippers of cattle in this state, without any legal excuse, and without any regard to what is a reasonable charge for such services.''

Upon such information being filed with the clerk and brought to the attention of the judges of the court of visitation, said clerk refused to issue a citation to the railway company, and the judges thereof declined and refused to make an order directing the clerk to issue the same, on the ground and for the reason that the information did not present a case for consideration and adjudication by said court of visitation as to any particular charges or rates paid to or demanded by said railway company, nor present a case which called for an exercise of the judicial powers of said court, but that the matters alleged in said information called for the exercise of powers which were purely legislative or administrative in their nature, the court being asked merely to determine and fix a schedule of charges which should regulate the rates or charges which might be exacted or demanded by said railway company in future, and were such powers as the court believed it could not exercise.

The attorney-general has filed a petition in this court, setting out the matters contained above, and praying that a writ of mandamus issue to the clerk and judges of said court of visitation commanding them to assume jurisdiction of, and to hear and determine, the case presented by said information.

The law creating the court of visitation is chapter 28 of the Laws of 1898 (Gen. Stat. 1899, §§ 5779–5820), entitled ''An act creating a court of visitation, declaring its jurisdiction' and powers, and providing for

proceedings and procedure therein." Section 1 creates a court of record with a seal, to be known as the court of visitation, consisting of a chief judge and two associate judges, and provides for their qualifications. Section 5 requires the appointment by the governor of a state solicitor, and that "it shall be his duty to appear and represent the state in all actions and proceedings before the court of visitation to which the state is a party." The act provides further:

"Sec. 7. The court shall sit at its rooms in the state-house, but may for good cause sit in any other place in the state, and shall be deemed in perpetual session for the transaction of business.

"Sec. 8. The court of visitation shall have power and jurisdiction throughout the state —

"1st. To try and determine all questions as to what are reasonable freight-rates, switching and demurrage charges, and other charges connected with the transportation of property between points in this state;

"2d. To apportion charges between connecting roads, and determine all questions relating to charges for the use of cars and equipments; and to regulate the charges for part car-load and mixed car-load lots of freight, including live stock;

"3d. To classify freight;

"4th. To apportion transportation charges among connecting carriers;

"5th. To require the construction and maintenance of depots, switches, side-tracks, stock-yards, cars and other facilities for the public convenience;

"6th. To compel reasonable and impartial train and car service for all patrons of the railroad;

"7th. To regulate crossings and intersections of railroads and regulate the operation of trains over them;

"8th. To prescribe rules concerning the movements of trains, to secure the safety of employees and the public;

"9th. To require the use of improved appliances

and methods, to avoid accidents and injuries to persons ;

"10th. To restrict railroad corporations to operations within their charter powers, prevent the oppressive exercise thereof, and compel the performance of all duties required of railroads by law ;

"11th. To summon juries, as a court of equity, in any case or matter before it ; such juries to be selected as may be directed by rule. Jurors to possess the qualifications, except as to locality, required by law for jurors in the district courts ;

"12th. Such other and further powers as are given by this act or may be conferred by law."

Section 9 provides that, in all matters within its jurisdiction, said court shall possess full common-law and equity powers. It may issue every appropriate writ and process to compel the attendance of parties and witnesses ; may issue writs of injunction and mandamus and appoint receivers to carry its judgments into effect, and shall have the same power to punish for contempt as district courts now have, and may exercise it in the same manner, and cause the attendance of a jury whenever required in the exercise of such power.

By section 10, the court has power to establish rules for its government and for the regulation of practice therein, and it is authorized to appoint masters, referees or receivers in causes before it. It may make rules regarding the framing and filing the proceeding and the entering and promulgating of orders and decrees, and generally regulate the practice to be used in said court where special provision is not made or special procedure prescribed.

Section 11 makes it the duty of the sheriff to whom any process of said court shall be directed or delivered to serve and execute the same without delay, and gives the court the same power over such officers as

the district courts have over sheriffs. Section 12 confers upon the court power to appoint a marshal to serve process, and also to appoint a bailiff. Section 13 relates to pleadings and amendments thereto.

Sections 14, 15, 24 and 25 read :

"SEC. 14. Whenever a complaint on oath shall be presented to the state solicitor, charging that any railroad company demands or collects unreasonable charges, discriminates for or against any shipper, violates any provision of law, or fails or refuses to perform any duty, or stating a valid ground of complaint for any other cause over which the court has jurisdiction, it shall be the.duty of said solicitor to forthwith file an information in the name of the state charging the matters set forth in the complaint.

"SEC. 15. Proceedings in said court shall be instituted by the filing of an information in the name of the state. Upon the filing of the information, the clerk shall at once issue a citation to the defendant and deliver or mail it to the sheriff of the county where it is to be served. The citation shall be accompanied by a certified copy of the information. The sheriff receiving such citation and copy shall without delay serve the same, in the same manner as a summons in a civil action in the district court is served, and shall make due return of service thereon, taxing thereon his lawful fees as for serving a summons, which return shall be made by delivering or mailing to the clerk. The citation shall require the defendant to answer the information within twenty days from the day of service. Reply, if any, shall be filed within twenty-five days from the day of service as shown by the return. At the expiration of twenty-five days from the date of service of the citation, as shown by the return, the clerk shall, whether an answer has been filed or not, enter the case on the trial docket for the first Monday of the next succeeding month, and it shall be thereafter subject to call for trial or disposition in its order on the docket; but, because of its superior public importance, or other sufficient reason,

the court may advance any case to hearing and determination out of its order on the trial docket."

"Sec. 24. If, upon the hearing of an information alleging the unreasonableness of any railroad company's rate for the transportation of any article or schedule of articles between given points on its line within the state, the court shall deem it probably unjust that such rate or schedule alone should be changed without changing or revising the entire schedule as to such articles over the entire line of such company, the court may order the information to be amended so as to bring such entire schedule before it for consideration ; and shall order the said company to answer such amended information, and shall as soon as may be proceed thereon, saving all testimony already taken or adduced.

"Sec. 25. When the court proceeds for the first time to determine what is a reasonable charge for the given service under consideration, the burden of proof shall rest on the railroad company to show what is a reasonable charge. On all subsequent proceedings to change or modify any charge, the burden of proof shall rest on the party moving to change or modify to show that the charge allowed by the prior decree of the court is unreasonable."

Section 26 provides that no schedule of rates or special contract or agreement promulgated or entered into by any railroad shall be receivable in evidence on behalf of such company as proof tending to show what is a reasonable charge for any services ; and the fact that any railroad company has been accustomed to demand or receive any given rate of compensation shall not be received as evidence of the reasonableness of such charge.

Sections 28 and 32 read :

"Sec. 28. Upon the conclusion of every trial, the court shall without unnecessary delay proceed to enter such decree as the pleadings and proofs warrant. After the trial of any action involving the reasonable-

ness of a general schedule of freight charges on any line of road, the court shall find specially such facts as it deems most material. It may find the value of the line of road and of all property used in connection therewith, either separately or in gross, the actual cost thereof, the amount of the capital stock, bonded and other indebtedness of the company, what, if any, part thereof is fictitious or fraudulent, the average yearly revenues of the company and the sources from which they are derived, whether its revenues will probably increase or diminish, the average expenses of operation and maintenance and the purposes to which they are devoted, what, if any, unreasonable or unlawful uses are made of the funds of the company, as well as other matters deemed of special importance ; but the failure of the court to make such findings, or any of them, shall not be ground for reversal of its decree. It shall find generally as to the reasonableness of the charges at issue, and may at its discretion find specially as to particular items. The court shall thereupon enter a decree in accordance with its findings and decision, adjudging and decreeing what are reasonable rates for each and every charge and service at issue in the case, and perpetually enjoining the defendant from demanding, charging or receiving any other or different rates or charges than such as are by the decree determined to be reasonable. The decree shall embody a complete schedule of the charges adjudged to be reasonable, and the classification of freight applicable to and necessary for the explanation thereof.''

''Sec. 32. If, after the promulgation of any order or decree of said court, any railroad company bound thereby shall refuse, or for thirty days shall neglect, to comply with or obey, in good faith, such order or decree, the court may, upon application made on three days' notice to said railroad company, and proof of such neglect or refusal, order sequestration of the whole or any part of said company's property, owned or leased, and appoint a receiver or receivers to forthwith take possession and charge of said property or

designated part of said property and operate the same and carry such order or decree into effect; and property so taken shall be operated by such receiver or receivers, who shall receive all income therefrom, until such company shall furnish security to the satisfaction of said court for its full and faithful obedience to and compliance with said order or decree; whereupon the accounts of such receiver or receivers shall be passed, and the net proceeds of operating said property shall be paid to said company and the property returned to it."

Section 34 provides for a review by the supreme court of final decrees of the court of visitation, in like manner as judgments of district courts may be reviewed, with power to stay the issuing of any writ or process, such stay not to effect the use, conclusiveness or exclusiveness of any such decree as evidence in any case or proceeding; no stay to be allowed unless the proceedings in error shall be commenced within sixty days after the promulgation of the decree.

*A. A. Godard,* attorney-general, *J. S. West,* and *Garver & Larimer,* for The State.

*Allen & Allen,* and *A. J. Myatt,* for defendants.*

The opinion of the court was delivered by

SMITH, J.: The constitution of this state, like the constitution of the United States, has created three departments of government, the executive, legislative, and judicial:

"ARTICLE 1.—EXECUTIVE.

"SECTION 1. The executive department shall consist of a governor, lieutenant-governor, secretary of state, auditor, treasurer, attorney-general and superintendent of public instruction. . . ."

---

*As *amicus curiæ*, Robert Dunlap, attorney for the A. T. & S. F. Rly. Co., with E. D. Kenna and A. A. Hurd, as counsel, presented a brief and argument in opposition to the application for a writ of mandamus.—REP.

"ARTICLE 2.—LEGISLATIVE.

"SECTION 1. The legislative power of this state shall be vested in a house of representatives and senate."

"ARTICLE 3.—JUDICIAL.

"SECTION 1. The judicial power of this state shall be vested in a supreme court, district courts, probate courts, justices of the peace, and such other courts, inferior to the supreme court, as may be provided by law. . . ."

The framers of the constitution of the United States were influenced by the doctrine of Montesquieu, then in the height of its influence, that the powers essential to governments should be distributed among three separate bodies of magistrates, viz. : Legislative, executive, and judicial. Madison, in No. 47 of the Federalist, page 375, affirmed that such doctrine was recognized by the convention as the foundation of its labors. Montesquieu wrote :

"There can be no liberty, . . . if the power of judging be not separated from the legislative and executive powers. . . . Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for the judge would then be the legislator. Were it joined to the executive power, the judge might behave with all the violence of an oppressor."

It will be noticed that there is no express provision in the Kansas constitution to the effect that persons charged with the exercise of powers properly belonging to the one shall not exercise any functions pertaining to either of the others. Yet this court, in the case of *In re Sims, Petitioner*, 54 Kan. 1, 37 Pac. 135, has said :

"We think, however, that under our constitution these powers are as clearly separated as though the framers of the constitution had said so in terms."

Mr. Chief Justice Kingman emphasized this by say-
ing that to confer both executive and judicial powers
upon a court is "as dangerous to good government as
it is subversive of the constitution which has carefully
kept separate the executive, legislative and judicial
departments of the government, 'to the end that it may
be a government of laws and not of men.'" (*Auditor
of State v. A. T. & S. F. Railroad Co.*, 6 Kan. 505.) In
another place he said that it is absurd to claim that
it is in the power of the legislature to give a court
authority to review acts which are purely executive
in their character. In *Coleman v. Newby*, 7 Kan. 82,
Mr. Justice Valentine discussed the separation of the
sovereign powers, and insisted that they must be in-
dependently maintained, and power exercised only by
the particular department to which it has been dele-
gated. He held that the power to make rules for the
district court could not be conferred upon the supreme
court, for the reason that it was a legislative function
which belonged to the legislature, and could not be
exercised by the judicial department. He stated that
the prescribing of rules by which human conduct
shall be governed in the future is a legislative power,
and that "to declare what the law is or was belongs
to the judiciary, but to declare what it shall be in the
future belongs to the legislature." If the making of
rules by the supreme court for one of the inferior
courts violates the constitutional limitation, certainly
the making of general rules and a schedule of rates
governing the future conduct of persons and corpora-
tions cannot be conferred on a court or judicial tri-
bunal.

Again, in *In re Davis*, 58 Kan. 368, 372, 49 Pac.
161, Mr. Justice Allen said :

"It is not asserted that the constitution does not
make a valid and effectual division of the powers of

government into executive, legislative and judicial departments, nor is the wisdom of such a division of powers questioned ; nor has there been any suggestion in the brief or on oral argument that such a division is unreasonable or illogical.   It has been generally, if not universally, accepted as the best and safest division of powers yet devised by man, and is recognized as firmly established by all writers on the constitution. .   .   .   The legislature enacts general rules for the guidance of all departments of the government.   It levies taxes and directs the expenditures of the money raised thereby, but it executes no law.  The judiciary declares the law, and directs as to its application to controversies that arise.   .   .   .   The fundamental law embodied in the constitution binds all departments of the government and fixes the limits of their powers.   To its mandates all must yield obedience ; for it is superior to any and all agencies created under it.''

All writers on constitutional law are agreed that the functions of the three departments should be kept as distinct and separate as possible, except so far as the action of one is made to constitute a restraint upon the action of the other to keep them within proper bounds and to prevent hasty and improvident action. ( Cooley, Const. Lim., 6th ed., 46.)   Keeping in view that the separation of powers named must be maintained, it will be well to refer to several sections of the act creating a court of visitation which fix its jurisdiction and authority, to ascertain what species of power is conferred upon that tribunal.

The first paragraph of section 8 gives authority '' to try and determine all questions as to what are reasonable freight-rates, switching and demurrage charges, and other charges connected with the transportation of property between points in the state.''   This, together with other sections, as we shall see, is a grant of judicial power to the court to determine what are

reasonable freight-rates for services already rendered; but as to what shall be charged in the future for such services it is legislative in character. Second, "to apportion charges between connecting roads, and determine all questions relating to charges for the use of cars and equipment; and to regulate the charges for part car-load and mixed car-load lots of freight, including live stock." This also combines both legislative and judicial powers, dependent on the manner the power is exercised. Third, "to classify freight." This is an administrative function. Fourth, "to apportion transportation charges among connecting carriers." This is subject to the criticism in respect to the first and second clauses. Fifth, "to require the construction and maintenance of depots, switches, side-tracks, stock-yards, cars and other facilities for the public convenience." This is administrative and legislative. Seventh, "to regulate crossings and intersections of railroads and regulate the operation of trains over them." This is administrative, and authorizes the court to make rules and regulations to govern the parties affected. It is thus, in a sense, the exercise of legislative power. Eighth, "to prescribe rules concerning the movements of trains, to secure the safety of employees and the public." This is, in a manner, a legislative power, as the rules established become the rules governing the railway corporation. Ninth, "to require the use of improved appliances and methods, to avoid accidents and injuries to persons." As this gives power to prescribe the appliances and regulate their use, it may be said to be legislative and administrative.

Powers manifestly not judicial are conferred by section 28, wherein the duty is imposed on the court to enter a decree, without unnecessary delay after the

trial of an action, involving a general schedule of freight-rates, and it authorizes the court to find specially such facts as it deems most material. The court shall thereon enter a decree in accordance with its findings and decision, adjudging and decreeing what are reasonable rates for each and every charge and service in the case, and perpetually enjoining the defendant from demanding or receiving any other or different rates or charges than such as are by the decree determined to be reasonable. It is provided that *the decree shall embody a complete schedule of the charges adjudged to be reasonable and a classification of freight* applicable to and necessary for the examination thereof. The nature of the power vested in the court by this section will be referred to hereafter.

Legislative power to prescribe rates which railway corporations may charge for carrying freight or passengers exists beyond question, and its exercise has been uniformly upheld by the courts. And this power the lawmakers may delegate to boards or commissioners, which has been frequently done. (*Stone v. Farmers' Loan & Trust Co.*, 116 U. S. 307, 6 Sup. Ct. 334, 338, 1191, 21 L. Ed. 636.) The extent of the power is curtailed only by limitations placed upon it by the courts in the application of certain constitutional guaranties prohibiting the destruction of property rights vested in the owners of the railway. (*Chicago &c. Railway Co. v. Minnesota*, 134 U. S. 418, 10 Sup. Ct. 462, 702, 33 L. Ed. 970.)

The court of visitation is endowed with complete common-law and equity powers, lavishly conferred. It has three judges, a clerk, a seal, and a marshal. It may summon juries, issue writs of mandamus and injunction, punish for contempt, appoint receivers, referees, and masters; and full power is granted to

The State v. Johnson.

carry its decrees into effect.   The attorneys for the state, the complainant, the court of visitation and the railway company unitedly agree that the court of visitation is a judicial tribunal, and that the powers conferred upon it are, in large part, purely judicial.

Being a court, the vital question decisive of the constitutionality of the law creating it is whether such tribunal has been endowed with legislative powers to an extent destructive of that separation of governmental functions ordained by the constitution.   In treating the propositions involved there is no room for originality.   We shall travel the beaten path of precedent to a conclusion, leaving to those who dispute the authority to which we adhere, and which we reannounce, the task of breaking away from settled principles and to blaze new roads through fields of innovation, regardless of those constitutional rules of safety adopted and handed down by our forefathers, the established result of wisdom and experience.

In *Reagan v. Farmers' Loan & Trust Co.*, 154 U. S. 362, 397, 14 Sup. Ct. 1054, 38 L. Ed. 1023, Mr. Justice Brewer, speaking for the court, said :

"It is doubtless true, as a general proposition, that the formation of a tariff of charges for the transportation by a common carrier of persons or property is a legislative or an administrative rather than a judicial function. . . .   The courts are not authorized to revise or change the body of rates imposed by a legislature or a commission ; they do not determine whether one rate is preferable to another, or what under all circumstances would be fair and reasonable as between the carriers and the shippers ; they do not engage in any mere administrative work ; but still there can be no doubt of their power and duty to inquire whether a body of rates prescribed by a legislature or a commission is unjust and unreasonable, and such as to work a practical destruction to rights of

52—61 KAN.

property, and if found so to be, to restrain its operation.''

Again, in *Interstate Commerce Commission v. N. O. & T. P. R. Co.*, 167 U. S. 479, 499, 17 Sup. Ct. 900, 42 L. Ed. 253, it was said :

'' It is one thing to inquire whether the rates which have been charged and collected are reasonable — that is a judicial act ; but an entirely different thing to prescribe rates which shall be charged in the future —that is a legislative act.''

In *Interstate Commerce Commission v. Alabama M. R. Co.*, 168 U. S. 144, 161, 18 Sup. Ct. 47, 42 L. Ed. 421, Mr. Justice Shiras, speaking for the court, said :

'' Discussion of those assignments is rendered unnecessary by the recent decision of this court, wherein it has been held, after elaborate argument, that congress has not conferred upon the interstate commerce commission the legislative power of prescribing rates, either maximum, or minimum, or absolute ; and that, as it did not give the express power to the commission, it did not intend to secure the same result indirectly by empowering that tribunal, after having determined what, in reference to the past, were reasonable and just rates, to obtain from the courts a peremptory order that in the future the railroad companies should follow the rates thus determined to have been in the past reasonable and just.''

In a late case decided by the supreme court of Nebraska (*Nebraska Telephone Co. v. State*, 55 Neb. 627, 76 N. W. 171), it was expressly held that the jurisdiction to determine what compensation a public service corporation may exact for services to be rendered by it is a legislative and not a judicial function. The opinion in the case of *Norwalk Street Ry. Co.'s Appeal*, 69 Conn. 576, 597, 37 Atl. 1087, 38 Atl. 708, is an able and well-considered argument of the questions involved here. The incapacity of the legislature to exe-

cute a power which is essentially judicial, and the judiciary to execute a power which is essentially legislative, was discussed with great clearness and force. On the question now under consideration it was said :

"The regulation of such charges is held to be distinctively a legislative function which may be delegated by the legislature to a subordinate legislative or administrative body, but if this subordinate body, or the legislature, exceeds its powers, and a person is thereby injured in his rights of property, he may invoke the judicial power to determine that question of legal injury ; and the reasonableness of the charges, although a question legislative in its nature, must be reviewed by the court as necessarily incident to the exercise of its judicial power.   But if the court should attempt to establish for the future a schedule of charges, it would exceed the limits of judicial power ; it would act as legislator in respect to a matter as to which it must also act as judge."

Foster, J., in the case of *Cotting v. Stock Yards*, 82 Fed. 845, said :

"It should not be assumed that courts, in deciding this constitutional question, can undertake to fix rates, but merely to decide whether the rates prescribed by the law are in violation of the complainants' constitutional rights."

In the same case Judge Thayer used the following language : "The judiciary have no power to prescribe a schedule of maximum rates."   In *Express Cases*, 117 U. S. 1, 29, 6 Sup. Ct. 556, 628, 29 L. Ed. 803, the court, in passing upon a decree of the lower court fixing the terms upon which a railroad and an express company should do business with each other, said :

"The regulation of matters of this kind is legislative in its character, not judicial.   To what extent it must come, if it comes at all, from congress, and to

what extent it may come from the states, are questions we do not now undertake to decide; but that it must come, when it does come, from some source of legislative power we do not doubt.''

In *Chicago &c. Railway Co. v. Wellman*, 143 U. S. 339, 12 Sup. Ct. 400, 36 L. Ed. 176, it was stated that the right to fix rates is a legislative one.

We start, then, in considering the boundaries of judicial and legislative power under our constitution and system of government, from a fixed monument, to determine whether the legislative power to make rates may be conferred upon the judicial tribunal known as the court of visitation.

The rate-making power, being essentially legislative in its nature, whether exercised directly by the legislature or delegated by it to a competent board or commission, can no more be imposed on or exercised by the judicial department than can the pardoning power of the governor or any other distinctively executive function. It is a cardinal principle of representative government that the making of laws and rules regulating the future conduct and fixing the rights of parties belongs to the legislative department — a power which can never be reposed in or exercised by the judiciary. Some of the legislative powers, as before stated, may be delegated to municipal boards and local commissions, but what is called the power to enact laws cannot be delegated; but whether these functions are such as may be delegated or not, they are wholly incompatible with judicial powers, and can never be conferred on or exercised by the judicial department. While the line of division between the three powers is not marked distinctly, and it is not always easy to lay down an abstract rule defining each of the separate powers of sover-

cignty, all courts and all authority unite in holding that the rate-making power is intrinsically legislative. In exercising such power, whether by the legislature or by a commission, general rules prescribing the duties, fixing the rights and regulating the conduct of persons and corporations in the future are made, and the combining of such a power with those essentially judicial, or vesting it in a court, is a palpable and flagrant violation of the constitutional principle and limitation regulating the separation of the sovereign powers.

Governor Leedy, in calling the special session which enacted the law, and in recommending the kind of legislation respecting freight-rates deemed by him to be necessary, said that the courts had decided "that the question as to whether an existing rate is reasonable is a judicial question, and that the question as to *what rate shall be collectable in the future is a legislative question.*"

We know that some powers are properly exercised by one department that are not strictly its own, but these are such as are expressly authorized by the constitution or as are necessary to its independence, or incidental to the execution of its essential powers. For instance, the courts appoint clerks, referees, receivers, masters in chancery, etc.— a power in its nature executive ; and they also frame rules governing the transaction of their business in the future, which partakes of the legislative character. The executive entertains and decides applications for pardon, hears and determines matters incidental to the exercise of an intrinsic executive function, and such hearing and decision by him take on something of the judicial nature. The legislature appoints its officers, punishes for contempt, and these, as well as some other

acts, partake of the executive and judicial character. However, these exceptional functions are either themselves expressly provided for in the constitution or only incidental to the essential sovereign power confided to each department, and most of the functions named are necessary to the independence of such powers. Along this line are a few acts which occupy an intermediate space between the departments not easily defined nor distinctive in character, and which may be performed by one department without trenching upon the main and essential functions of the other. Some instances of the exceptional acts and powers referred to were cited by Mr. Justice Johnston in *In re Sims, Petitioner*, infra, but conferring upon a single tribunal powers intrinsically judicial, intrinsically executive and intrinsically legislative has never been sanctioned by any court nor supported by any writer on the constitution.

This act undertakes to give the court of visitation authority to act as legislator and judge in the same matter, to prescribe for the future regulation, government and control of corporations, persons, and property, sit in judgment on its own rules, regulations, and laws, render judgments between parties, impose penalties to the extent of imprisonment for any adjudged violations; and, accompanying these powers so conferred, are numerous and important functions which are essentially executive.

The case of *In re Sims, Petitioner*, infra, involved the unwarranted combination of executive and judicial powers. It was held that a county attorney, although closely connected with courts, was an officer whose duties were mainly executive, and that the giving of judicial functions to aid him in the discharge of his executive duties conflicted with our theory of govern-

ment and constituted a breaking down of constitutional barriers devised to prevent tyranny and despotism.

So jealously has this court guarded and upheld this principle of the separation of sovereign powers that it recently decided that judicial powers cannot be reposed in a notary public, and that an act of the legislature expressly conferring upon a notary the judicial power to compel a witness to appear and testify in obedience to a subpœna was unconstitutional and void. Notaries public are authorized to subpœna witnesses and take depositions, and although the power of compelling the attendance of witnesses and the giving of testimony is in a certain sense incidental to the taking of depositions, the court overruled earlier cases and held it to be an unconstitutional combining of executive and judicial powers. (*In re Huron,* 58 Kan. 152, 48 Pac. 574, 36 L. R. A. 822.) The Price-raid commission, made up of executive officers of the state, was given authority to hear and determine what was due on certain claims, and it was held that the power exercised by it was not so far judicial in character that the supreme court could take cognizance of an appeal provided for in the statute. (*Wilson v. Price-Raid Aud. Com.,* 31 Kan. 257, 1 Pac. 587.)

In *In re Sims, Petitioner,* 54 Kan. 1, 4, 37 Pac. 135, 25 L. R. A. 111, Mr. Justice Allen, speaking for the court, said:

" The single question presented for our consideration is, whether that portion of the statute which authorizes the county attorney to punish as for contempt is in violation of the constitution of this state. Nothing is more firmly fixed in the governmental systems of all English-speaking countries than the division of powers between the three great departments of government, the executive, legislative, and judicial. The question before us is whether the legislature has

power to confer on an executive officer charged with the duty of searching out violations of the law, inquiring into facts, instituting and carrying on prosecutions for violations of the criminal laws of the state, the power, at the same time, and as ancillary to the performance of his duties as a prosecuting officer, to commit persons to jail as for a contempt of his authority. . . ."

" It is sought to distinguish the case before us from those cited because of provisions in the constitutions of Wisconsin and Indiana with reference to the separation of executive and judicial powers. We think, however, that in our constitution these powers are as clearly separated as though the framers of the constitution had said so in terms. It needs but a suggestion to show that the combination of executive and judicial powers may become tyranny at once. The advancement in the science of government made in modern times is due to the separation of the three great coordinate departments. If the legislature may confer on the county attorney one of the highest and most distinctive attributes of judicial power, that of punishing for contempt, to aid him in ascertaining from witnesses the facts with reference to violations of law, might the legislature not also confer on any attorney the power to examine witnesses in civil cases in the same manner, and to commit them for contempt if they refuse to answer his questions? Might it not also give to any executive officer from the governor down the power to subpena witnesses to inform his judgment and to aid him in any executive decision or determination? And if the rule is established, can it be doubted that the division between executive and judicial offices will be completely broken down, and all constitutional barriers removed from those forms of oppression which have always attended this combination? . . . This is a commingling and confusing of executive and judicial functions in a manner incompatible with the constitution, obnoxious to its whole spirit and to the spirit of free institutions, and the act to that extent is void."

If the legislature is devoid of power to confer judicial functions upon executive officers, is there not the same lack of power to grant legislative and executive authority to a judicial tribunal? Mr. Justice Allen, in this opinion, did not even suggest that the power conferred upon the county attorney might be lodged in him as incidental to his executive duties or in aid thereof. In the same case Mr. Justice Johnston, in a concurring opinion, said:

"No case has been sustained, however, where the new duties conferred upon an officer were incompatible with those already imposed by such office. . . . It is not within the power of the legislature to make a judge an arbiter in his own cause, and to give an attorney for one of two adverse parties the power to determine the controversy is wholly inconsistent with our system of jurisprudence."

In *Auditor of State v. A. T. & S. F. Railroad Co.*, supra, a statute prescribed the manner in which the property of railroads and other corporations should be assessed for the purposes of taxation, and one of the sections provided:

"The county clerks of the several counties in which any railroad company now has, or hereafter may have its track and roadway, or any part thereof, shall constitute a board of appraisers and assessors for the property of said railroad company."

There was a provision for an appeal to the supreme court from the assessments affixed by said board of appraisers. An appeal taken was dismissed, upon the ground that assessment and taxation were legislative powers, and that to confer upon this court the power of review over a decision of said board of appraisers and assessors was an attempt to confer legislative functions upon a judicial body. Referring to the legislative and judicial departments, Mr. Chief

Justice Kingman, speaking for the court, page 507, said :

" The two are separate and distinct departments of government, each having its appropriate sphere of action, and each clothed with powers to execute the duties pertaining to its own functions ; and when each confines itself within the sphere of its constitutional power there is less danger of that peril pointed out by an eminent jurist when he says, in reference to this matter : ' There is an inherent and eternal difficulty in confining power of any kind within its proper limits. This general rule holds eminently true in regard to legislative and judicial bodies.' ( Sedg. Const. L. 217.) "

The power to fix rates and classifications is without doubt conferred upon the court of visitation by the terms of the law under consideration. By section 24, upon the hearing of an information alleging unreasonableness in any rate for the transportation of any article or schedule of articles " between given points " on its line, if the court shall deem it probably unjust that such rate or schedule alone should be changed without changing or revising the entire schedule as to such articles " over the entire line of the company," the court may order the information to be amended so as to bring such *entire schedule* before it for consideration and proceed to hear the complaint. Under section 28, it is authorized to find generally as to the reasonableness of the charges at issue and " thereupon enter a decree in accordance with its findings and decision, adjudging and decreeing what are reasonable rates for each and every charge and service as issue in the case, and perpetually enjoining the defendant from demanding, charging or receiving any other or different rates or charges than such as are by the decree determined to be reasonable. The decree shall

embody a complete schedule of the charges adjudged to be reasonable, and the classification of freight applicable to and necessary for the explanation thereof.''

By section 32, after the promulgation of such order or decree, if the railroad company affected shall refuse to obey the same for thirty days, the court may seize the whole or any part of the company's property and appoint a receiver to take possession and charge of the same, to operate the road and carry the order or decree into effect. It will be noticed from this that the fixing and adjustment of rates and classification are not necessarily based upon the complaint of the injured shipper. To illustrate : In the case at bar Mr. Robison complained of excessive charges for the shipment of live stock from El Dorado to Kansas City, Kan., a distance of 200 miles. If the court of visitation had taken up the information of the state solicitor based on this complaint, and deemed it probably unjust that the rate complained of for transportation of stock from El Dorado to Kansas City, Kan., should be changed without changing and revising the entire schedule of such freight over the entire line of the company, it could order the information to be amended to bring such entire schedule before it for consideration. Its consideration of the entire schedule is not solely for the purpose of fixing a reasonable rate on stock between the points named over the line of the railway, and of which the shipper complains, but for the more extended purpose of fixing a schedule for such articles over the entire line of the company in Kansas ; and when so fixed and promulgated such rates become as effective and binding as they would be between the points mentioned in Mr. Robison's complaint.

Thus we have the court of visitation, on its own motion, without complaint from any shipper, bring-

ing before it for change and revision the entire schedule of freight-rates over the whole system in Kansas of a great railway company. Whatever characterization may be given of the power exercised in determining what is a reasonable rate for Mr. Robison on his stock from El Dorado to Kansas City, Kan., it cannot be said that by such process and under such proceeding the decree promulgating a body of rates over all other parts of the road than that existing between the towns named can be other than the exercise of power conferred by the constitution upon the legislature. The statute under consideration is skilfully constructed to confer legislative power upon the court of visitation to fix rates. This deposit of authority, when exercised, is made to take the form of a decree in chancery, indicating that it is the result of a decision after a contest in court between a plaintiff and a defendant. In *A. T. & S. F. Railroad v. D. & N. O. Railroad*, 110 U. S. 682, 4 Sup. Ct. 192, 28 L. Ed. 207, it was said:

"A court of chancery is not, any more than is a court of law, clothed with legislative power. It may enforce, in its own appropriate way, the specific performance of an existing legal obligation arising out of contract, law, or usage, but it cannot create the obligation."

This tribunal possesses the extraordinary power of proclaiming in its decrees in a suit, in the name of the state (which is not interested as shipper) against the railroad company schedules which are made conclusive in the future ; and any future controversy which might arise between the shipper and the railroad company has thus been prejudged and determined. Here is found a combination of the legislative and judicial functions — the legislative power of fixing a

schedule of maximum rates in respect to services to
be rendered in the future by the railroad company to
a private shipper, and the judicial power by which a
rule for the first time promulgated by that court as to
what shall be reasonable rates, by decree and execu-
tion thereof is enforced upon the railroad company,
so that when a controversy does actually arise be-
tween a shipper and a railroad company as to whether
a charge for the service performed be reasonable or
not, such controversy has been prejudged and settled,
not in an action between the parties themselves, but
in a proceeding in which the state has undertaken to
prejudge and determine this question and settle the
rule of conduct to be binding upon the railroad com-
pany as to future controversies with private persons.

In the usual process of making laws and providing
for their enforcement there is an interim between their
enactment and their execution, affording opportunity
for thought and preparation by persons affected. Here
no time is lost. When a freight-rate is established by
this court, it goes forth with judicial sanction of rea-
sonableness stamped upon it, and, by a chancery de-
cree, a fixed rate is promulgated and simultaneously
its fairness judicially determined. Thus the victim
first learns of the existence of law by reading a decree
enacting it, in which he is condemned for its infrac-
tion. In *Nebraska Telephone Co. v. State*, 55 Neb. 637,
76 N. W. 174, the following pertinent language was
used :

"Fixing the compensation which public-service cor-
porations may charge for services to be rendered by
them is legislating. It is lawmaking. The power of
the courts is limited to declaring what the law is, and
they are precluded by the constitution from perform-
ing legislative functions ; and though the courts of the
land have from time to time declared laws fixing the

compensation which public-service corporations might charge for services to be rendered by them void because the compensation fixed by the law was unreasonable in that the enforcement of the statute would confiscate the corporation's property, and thereby deprive it of its property without due process of law, we know of no court which has ever claimed that it had authority to determine what compensation would be a reasonable one for a service to be performed by such corporation."

Counsel for petitioner do not seem to question the rule that the establishment of freight-rates is a legislative prerogative. Yet, as we understand them, they contend that this establishment may be accomplished through the decrees of a judicial tribunal, in furtherance of and incidental to granted power to determine what are reasonable rates. In other words, admitting that to decide what is a reasonable rate is a judicial power, they argue that when a court determines this it may proclaim its findings in respect thereto, and this declaration is binding, not only upon parties to the inquiry, but upon all other parties who may thereafter be affected. Conceding that courts cannot legislate, they insist that courts may do that which in legal effect is nothing more or less than legislation. It is one thing to determine whether a freight-rate is reasonable in a controversy between a shipper and a carrier, and another thing to decide, at the suit of the state or a private party, what shall be charged in the future for such services. A decision made in the first case might be a precedent when a similar controversy subsequently arose ; but the promulgation of the first decision, however formally done by a judicial tribunal, could not have the far-reaching effect of a legislative act, for it is peculiarly within the province of the legislature to regulate future conduct. Chief Justice

Marshall said : " The legislature makes, the executive executes, and the judiciary construes the law." ( *Waymon v. Southard*, 10 Wheat. 1, 6 L. Ed. 253.)   In the *Sinking-fund Cases*, 99 U. S. 700, 761, 25 L. Ed. 516, Mr. Justice Field said :

" The distinction between a judicial and a legislative act is well defined.   The one determines what the law is, and what the rights of the parties are, with reference to transactions already had ; the other prescribes what the law shall be in future cases arising under it."

In *Norwalk Street Ry. Co.'s Appeal*, 69 Conn. 594, 37 Atl. 1086, Justice Hammersley used this language :

" One controlling consideration in deciding whether a particular act oversteps the limits of judicial power, is the necessary inconsistency of such acts with the independence of the judicial department, and the preservation of its sphere of action distinct from that of the legislative and executive departments.   A main purpose of the division of powers between legislature and judicature is to prevent the same magistracy from exercising in respect to the same subject the functions of judge and legislator.   This union of functions is a menace to civil liberty, and is forbidden by the constitution.   There is no intrinsic difficulty in recognizing a plain infraction of such prohibition."

Judge Cooley, in his *Constitutional Limitations*, page 108, notes the distinction between legislative and judicial power, and says :

" ' The difference between the departments undoubtedly is, that the legislature makes, the executive executes, and the judiciary construes the law.'   And it is said that that which distinguishes a judicial from a legislative act is, that the one is a determination of what the existing law is in relation to some existing thing already done or happened, while the other is a predetermination of what the law shall be for the

regulation of all future cases falling under its provisions.''

Counsel for the defendants say in their brief : '' The great purpose of the act was to create a tribunal for the purpose of determining questions of general interest by judicial methods.'' The matter of general interest mentioned, as evidenced by the proclamation which called the special session of the legislature together, was the establishment of maximum freight-rates over the railways of the state, which, as before stated, the governor informed the senate and house was a legislative question. In *Western Union Tel. Co. v. Myatt*, 98 Fed. 335, 354, Judge Hook said :

'' In the case under consideration it seems clear, not that the members of the court of visitation are representative executive officers of the state, but that they are the direct and active representatives of the legislative department. It would certainly be as inconsistent with our system of jurisprudence to empower them to act judicially in matters whereof they had legislative or administrative cognizance as it would be to confer judicial powers upon an executive officer.''

The mayor and council of cities of the first class in this state are granted power to fix the rate of carriage of persons, drayage and transportation of property other than by railroads within the city. In some cases the mayor and council are invested with judicial power. (*Bland v. Jackson*, 51 Kan. 496, 33 Pac. 295.) All ordinances must be reasonable. And whether such ordinances are reasonable is a judicial question to be determined by the court. (*Kansas City v. McDonald*, 60 Kan. 481, 57 Pac. 123.) If such mayor and council could be invested with power to pass an ordinance fixing the maximum rate to be charged by hackmen and draymen within the city, and at the same time judicially determine that rates

so prescribed and fixed by such ordinance were reasonable, we would have a case parallel to the one at bar, presenting a confusion and commingling of legislative and judicial power not to be tolerated under a democratic form of government.

Whether certain powers mentioned above, other than judicial, conferred by statute upon the court of visitation, are strictly legislative, administrative, or ministerial, it is unprofitable to inquire. It is enough to say that they are not judicial powers, and when that fact is determined they fall outside the boundary lines to which the functions of courts extend. In the case of *Western Union Tel. Co. v. Myatt*, supra, the circuit court of the United States for the district of Kansas considered fully the questions presented in the case at bar, and in an able opinion the learned judge, after a review of many authorities, only a part of which we have cited, reached the same conclusion at which we have arrived. Counsel for complainant Robison frankly state in their brief that "if the established schedules of charges be made for services to be performed in the future is classed as purely legislative or administrative in its character, then we concede that the court of visitation, if it is a court, could not be vested with any such power." And they further concede that where the same act which creates a tribunal also attempts to vest it with these separate and independent powers (and it is evident that the legislature would not have created such a tribunal for the exercise of one class of such powers only), the whole act must fall because of the invalidity of the inseparable part.

The best method for the determination of legislative intent is to confine the search to the law itself. If a statute is unconstitutional in a part which is

separable and independent, and can be eliminated, courts sometimes lop off the obnoxious provisions, leaving the remainder to stand. Mr. Justice Brewer, in *C. B. U. P. Rld. Co. v. A. T. & S. F. Rld. Co.*, 28 Kan. 453, 460, stated the rule summed up from the highest authorities, as follows :

" The legislature never enacts laws upon the supposition that one part of them is in conflict with the constitution and must fail ; it always proceeds upon the supposition that all that it does is within its constitutional power. Hence it never in terms says that, if one portion of its statute fails, the other portion must also fail, nor that it rests one part upon the supposed validity of another part. It legislates as if all that it attempts to do was within its constitutional power ; and when, in pursuance of its constitutional duty, the court ascertains that one part of its legislation conflicts with the constitution and must fail, the inquiry is not whether the balance of the statute is said by the legislature to depend and rest upon the unconstitutional part, but whether in the nature of things and by reason of the evident interdependence of the two, one upon the other, the courts can fairly say that the legislature intended the two to stand together as a single entity, the one dependent upon the other, or the one an inducement or compensation for the other, or the two together making a single compact and harmonious whole ; and, whenever that appears, then the unconstitutionality of either invalidates both."

We think that by the several provisions of the statute under consideration legislative, judicial and administrative powers are so inextricably interwoven and bound up together as to render their separation impossible. There is absolute confusion in the law and obliteration of all dividing lines. One kind of power is fused with and welded upon another.

We must therefore hold that said court of visitation is wholly without that authority and jurisdiction

The State v. Johnson.

which the legislature appears to have intended to confer upon it. We concur in the judgment of the judges of that court in their refusal to act in the matter presented to them, for the reason that rate making is a legislative and administrative function incompatible with judicial power. We are not unmindful of the rule which obliges us to uphold legislative acts unless their provisions clearly violate some constitutional requirement, and that a doubt upon that question sustains the law. Where one department of government, however, having functions peculiar to itself, attempts to augment its power or extend its prescribed and legitimate sphere of operations beyond the boundaries marked out by the constitution, we cannot shrink from the duty of defining those limits and obstructing such encroachment in a proper case, according to our best understanding, in the light thrown upon the question by statesmen, judges and lawyers who have considered, spoken and written upon the subject of constitutional limitations of power. Despotism begins when the executive, legislative and judicial departments of government cease to be independent of one another, and the tyrant exercises without check the powers of the three united.

The peremptory writ of mandamus will be denied.

JOHNSTON, J., concurring.

DOSTER, C. J. (dissenting) : I dissent from the judgment of the majority of the court in this case and dissent from much that is said in the opinion of Mr. Justice Smith. In expressing my non-concurrence, I do not wish to be understood as affirming beyond all question the validity of the statute called the " court of visitation act" in all its details, nor even in its general scope and design. No particular parts of the

act have been assailed except as subsidiary to its main provisions and as inclusive in the general whole; consequently I have not taken the trouble to ascertain whether particular portions of it may not be repugnant to the organic law. This might be the case and yet the substantive part of the enactment be capable of separation from the remainder and entirely within constitutional limits. The question whether the act in its essential provisions is violative of the fundamental law must be resolved, in my judgment, in its favor because of the grave doubts involved in the subject, if for no other reason. I have not undertaken to satisfy myself as to its constitutional validity. It is sufficient for my purposes that reasonable doubts upon the subject exist. That a reasonable doubt as to the repugnance of a statutory enactment to the constitution of the state determines the decision in favor of the statute is a rule to which the courts make constant reference and by which they profess to be bound. (Cooley, Const. Lim., 6th ed., 216.) Unfortunately the declaration of this rule is often a mere profession and not an actuality of performance. A judicial decision which requires a lengthy and labored argument to clear away all doubts as to the constitutional validity of a legislative enactment is one which belies all professions of adherence to the rule. If a case of constitutional invalidity is clear and free from doubt, the ordinary mind can be led to a positive conclusion without following to any great length the involved and sinuous ways of legal metaphysics. With much respect to my associates, I think they have succeeded only in involving the law in doubt.

The opposition to the act under consideration is based upon the theory of the distribution of governmental powers into the three classes, called legislative,

The State v. Johnson.

judicial, and executive, and the non-assimilation of one with the others.   There is no disposition to question such classification of powers, nor the necessity of excluding public officers charged with the execution of one of them from the domain of the others. (Without admitting that the act produces an interblending of separable powers, I wish to say that in the practical affairs of government there is not and cannot be any such thing as a clearly defined and complete separation of such powers. (There is not and cannot be any such thing as a legislature which wills and ordains, and nothing else; a judiciary that interprets and decides, and nothing else, and an executive that enforces, and nothing else.   The metaphysical distinction between the spheres of will, judgment and action cannot be applied in the domain of political science.   In the practical affairs of government the distinction between legislator, judge and executioner is speculative and doctrinal, rather than actual, and the lines of demarcation between them vague and fanciful, rather than real. There are points at which the functions of the one assimilate so closely to the others as to be impossible of detection and separation.   The most that can be done is to recognize the theoretical classification made and preserve in general outline the distinction drawn.) "Modern political science has, however, generally discarded this theory (the distribution of governmental powers), both because it is incapable of accurate statement, and because it seems to be impossible to apply it with beneficial results in the formation of any concrete political organization." (Good. Comp. Adm. L. 20.   See, also, Wils. Cong. Gov. 285–306; Stev. Sources Const. of U.S. 47; Von Holst, Const. L. of U. S. 67, 68.)

A most striking instance of the interfusion of the

separable powers of government was furnished by the act of congress of 1804, providing for the government of the territory of Louisiana. By section 12 of that act, the governor and judges of the territory of Indiana were empowered to enact, promulgate and administer a code of law for the government of the new territory. The judges were not only authorized to assist in the making of the laws, but were authorized judicially to administer them when made, and were further authorized to perform the executive duty of making appointments to the inferior judicial offices. Nor are the views as above expressed those of political theorists only. They are shared by the courts as well :

"The position that a legislature cannot constitutionally perform a judicial act, is supported by no authority ; nor has it any reason in public policy or convenience. On the other hand it is contradicted by legislative usage and the highest judicial decisions. It is true, as has been argued by the plaintiffs, the constitution of Pennsylvania divides the powers of government under three general heads of legislative, executive, and judicial ; that it ordains that 'the legislative power of the commonwealth shall be vested in a general assembly, which shall consist of a senate and house of representatives' ; that 'the supreme executive power shall be vested in a governor,' and that 'the judicial power shall be vested in a supreme court,' etc.

"This, however, is only a declaration of the general system or theory of our government, and was never intended to fix exact and impassable limits to each department. There are things necessary to be done in the administration of the government, of a character so mixed and blended, partaking of the elements of all these divisions of power, that we could not know to which to assign it ; it could not be exclusively claimed by either." (*Livingston and Nicholson v. Moore et al.*, 1 Bald. 449.)

Mr. Justice Johnston, of this court, in his concurring opinion in *In re Sims, Petitioner*, 54 Kan. 11, 37 Pac. 138, 25 L. R. A. 113, remarked:

"I am unable, however, to sustain the position of the petitioner, and hold that the vesting of judicial power in an executive officer, and requiring him to perform both executive and judicial functions, is a sufficient objection to the statute. It is highly important to separate the legislative, judicial and executive functions, and that the officer of one department should not exercise the functions conferred upon another. Under our system, however, the absolute independence of the departments, and the complete separation of the powers is impracticable, and was not intended.

"'It is true, with some exceptions, that the legislature cannot exercise judicial or executive power; that the courts cannot exercise legislative or executive power, and that the executive department cannot exercise legislative or judicial power; but it is not true that they are entirely separate from each other, or independent of each other, or that one of them may not in some instances control one of the others.' (*Martin v. Ingham*, 38 Kan. 654.) The governor has been vested with some judicial functions, and the legislature acts judicially when it tries a charge of contempt and adjudges punishment therefor. Ministerial duties have been placed upon courts, and while scrupulous care should be used to prevent an officer of one department from intruding to any extent upon the duties conferred upon an officer of another department, nothing in our state constitution, as there is in that of some other states, prevents the vesting of more than one function in a single individual. Illustrations of conferring more than one of these powers upon the same person are numerous. It has been held that the mayor of a city of the second class might, while acting as mayor, exercise the powers of a court, although the statute did not in terms create him a court. (*Prell v. McDonald*, 7 Kan. 426.) Judicial powers have been conferred on county commissioners and coroners, whose

duties are mainly ministerial.    Probate judges, whose duties are mostly judicial, have had conferred upon them many ministerial duties, and legislation giving such powers has been upheld.    (*In re Johnson*, 12 Kan. 102 ; *Intoxicating-liquor Cases*, 25 id. 751.)    Other instances might be cited, but these are sufficient to show that the legislature may confer judicial powers upon an executive officer, provided such duties are not inconsistent with those required of such officer.''

Nor is the lodgment of dual, and even tripartite, governmental powers in a single tribunal lacking in illustration among the decided cases.    Indeed, the decisions in which it has been allowed are almost as numerous as those which declare the general theory of distributive powers.    In *State of Kansas v. Young and others*, 3 Kan. 445, 448, it was held that, under the organic act of the territory of Kansas before its admission as a state, municipal courts for the enforcement of municipal regulations might be created, although by section 27 of such organic act the judicial power of the territory was vested in a supreme court, district courts, probate courts, and justices of the peace.    A similar ruling was made in *People v. Provines*, 34 Cal. 520.    In that case it was held that one holding the judicial office of police judge of the city and county of San Francisco might at the same time hold and perform the executive office of police commissioner of the city and county.    The reason for this holding, and also that of *State of Kansas v. Young and others*, supra, was that the effect of the distributive clauses of the constitution was confined to the central government and did not extend to the minor depositaries of power.

In *Hovey, Governor, v. The State, ex rel. Carson*, 119 Ind. 395, 21 N. E. 21, it was held that, while appointments were in their nature executive acts, they might

nevertheless be exercised by the legislature as to certain of the managing officers of the charitable institutions. In *Fox v. McDonald*, 101 Ala. 51, 13 South. 416, 21 L. R. A. 529, a similar ruling was made. In *People, ex rel., v. Nelson et al.*, 133 Ill. 568, 27 N. E. 217, it was held that a power given to the judges of the circuit and county courts to make certain appointments to office might be rightfully exercised. In *Callen v. Junction City*, 43 Kan. 627, 23 Pac. 652, 7 L. R. A. 736, it was held that the statute which vested in the judge of the district court the power to determine as to the advisability of making additions to the territorial limits of cities was not unconstitutional as being a delegation of legislative power to a judicial officer. The same decision was made in *Huling v. The City of Topeka*, 44 Kan. 577, 24 Pac. 1110. In *Lynch v. Chase*, 55 Kan. 367, 40 Pac. 666, it was held that where the proceedings to remove the incumbent of a public office involved the examination of facts and the exercise of judgment and discretion, and although the power to hear and determine was in that, as in other cases, of a judicial nature, it was not judicial in the sense that it belonged exclusively to the courts, and therefore that it might be conferred upon and exercised by the governor or other proper executive officer.

The books abound in similar decisions. I have selected those above cited at random. I have done so, not upon the supposition of their direct bearing upon the question for decision in·this case, but to illustrate the frequency with which the theoretical separability of the powers of government is repudiated, or at least denied application. I grant that these cases do not establish the proposition that powers both judicial and legislative were rightfully conferred by the court of

visitation act, no more than the cases cited in the majority opinion establish the proposition that the powers conferred by that act were both legislative and judicial, and, therefore, impossible of constitutional exercise. However, the cases I cite do establish what I think is a vital point in this controversy, namely, that a department of government, in the execution of a power essentially belonging to it, may, indeed often must, administer some of the incidents of its power in accordance with the forms and methods of the other departments. For instance, as remarked by the supreme court of Massachusetts in considering the nature of the power of city authorities to construct and remove sidewalks, "the power to determine whether public convenience requires the construction of a sidewalk, and equally so its removal, involves the exercise of judgment not administrative only, and the exercise of the power is judicial in its character, although expressed in a legislative form." (*Attorney General v. Boston*, 142 Mass. 204, 7 N. E. 722.) Many of the cases hereafter cited will further illustrate this proposition.

The decision of my associates is based upon the assumption that the power to declare a schedule of railroad traffic charges is a legislative power. I deny that such is true in the sense in which the claim is made and in the sense in which it is necessary to make it in order to reach the conclusion at which they have arrived. There is not a single case in the books giving countenance to the claim as made; on the contrary, there is not a case which, in terms or in its rationale, does not decide or give countenance to a different theory. The power to declare a schedule of railroad rates is legislative only in the sense that the subject-matter of railroad rates is within legislative

The State v. Johnson.

jurisdiction.  The making of the rate itself is not a legislative duty, but, on the contrary, may be committed to an inferior tribunal or body precisely as was done in the act under consideration.  If the making of a schedule of railroad rates is the exercise of a legislative power, it must be therefore exercised by the legislature and cannot be delegated.  But it can be delegated.  It has been delegated, and legislative acts delegating the power have been in every instance upheld.  (*Stone v. Farmers' Loan & Trust Co.*, 116 U. S. 307, 6 Sup. Ct. 334, 1191, 29 L. Ed. 636; *Reagan v. Farmers' Loan & Trust Co.*, 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014; *Express Co. v. Railroad*, 111 N. C. 463, 16 S. E. 393, 18 L. R. A. 393; *Railroad Commissioners v. P. & A. R. R. Co.*, 24 Fla. 417, 5 South. 129, 2 L. R. A. 504, 12 Am. St. Rep. 220; *Georgia Railroad et al. v. Smith et al., Railroad Commissioners et al.*, 70 Ga. 694.)  There are numerous other cases to the like effect, and none to the contrary.

There is a difference between the power to make a law and the power to adopt and enforce rules and regulations to effectuate the policy or accomplish the purposes of the law.  The former is legislative and cannot be delegated; the latter is the subject of constant exercise by inferior tribunals clothed with mixed legislative, judicial and executive authority.  While, therefore, the legislature, by virtue of its general authority over the subject of railroad traffic charges, may make a schedule of rates, the power to do so is not of that essential and inherent legislative character which forbids its exercise by some other tribunal thereunto lawfully authorized.

The concrete question now presented to us is, What of necessity must be the nature and functions of the tribunal to which the power is delegated?  Must the

agency be of necessity like the principal which created it — legislative in character and methods — or may it be judicial in its nature and attributes, or may it be a combination of both?   I have yet to hear a reason why the legislature may not employ judicial agencies in the ascertainment of the reasonableness of a schedule of traffic rates.   To the unconditioned exercise of legislative authority over the subject of transportation charges there is but one limitation.   The rates fixed, whether by direct action of the legislature or by a commission or other tribunal created by it, must be reasonable to the carrier.   They must not be so low as to prevent the carrier earning a reasonable income, and thereby amount to a deprivation of property without due process of law.   They must not be confiscatory, as it were.   This is not only the settled rule but the just decision of all the courts.   The converse of this proposition is equally true, and, so far as judicial enunciation is concerned, is a far older rule. (*Johnson v. Pensacola & Perdido R. R. Co.*, 16 Fla. 623, 26 Am. Rep. 731; Hutch. Carr., 2d ed, § 443.)

From the earliest time the rule has been that the charges of a common carrier must be reasonable, and from the earliest time the question as to the reasonableness of the carrier's charges has been a judicial one.   In the early days, before the business of transportation had assumed the proportions which now exist, and before it came to be conducted by the agencies now employed, the question as to the reasonableness of a carrier's charges was determinable with comparative ease and certainty in the particular cases in which it arose.   The problems involved in it were simple.   Transportation was carried on by the use of vehicles drawn by animals over the free highways, or, for limited distances, in small vessels of inexpensive

character. The factors of the problem were few in number and easy of comprehension. Conducted as the carriage of goods now is over lines of railway hundreds, perhaps thousands, of miles in length, and requiring thousands of men and millions of money safely and expeditiously to transact it, and vitally affecting, as it does, every member of the body politic, it is impossible of judicial regulation in the matter of reasonableness of charges through the determination of particular cases as they arise. In the settlement of every rate question are involved matters of original cost and continued maintenance; of the competition of rival lines; of distance; of long and short hauls; of expense of train service; of taxation of property; of car accounting with other roads; of classification of goods; of responsibility as warehouseman; of insurance against negligence; and a hundred or more others which in the first instance are only known to and appreciable by the railroad expert.

Every one of these matters is involved in the problem of rate making between any two given points. The determination of the reasonableness of the rate upon live stock, for instance, between the two points mentioned in these proceedings, El Dorado and Kansas City, Kan., is no less complicated and difficult than is the determination of the reasonableness of a general freight schedule upon all classes of goods from and to all other points. The determination of the one problem as between the two points practically determines the same problem as between all other points. The factors involved are essentially the same. To impose upon a shipper the obligation of determining, in his own interests and at his own expense, the reasonableness of a freight charge as to any particular shipment of goods, involving as it does the considera-

tion of questions which tax the best brain of the world, and to deny him relief unless he will do it, would be an unspeakable outrage. It is not done any longer. It is not undertaken any more.

Thirty-five years have elapsed since the first railroad entered upon Kansas soil. During that time not a single common-law controversy over the reasonableness of railroad charges has reached this court. I doubt whether any have been brought in any of the courts of the state. The common-law rule, which allowed them to be brought as particular instances of claimed overcharges occurred, while still in existence, no longer has application, according to common-law methods. To refer an aggrieved shipper to the common-law remedy is like holding the word of promise to the ear and breaking it to the hope. I claim that the common law, while still requiring reasonableness of charges by the carrier, no longer undertakes the adjustment of particular disputes as they arise, but it aggregates such disputes and settles them in a judicial controversy to which the public is a party on the one hand and the carrier a party on the other; that is, I claim that the rule for so doing is in process of evolution through the adjudications of the courts. I grant that no adjudication directly declarative of such rule has been made, but I insist that the logic of every recent decision (and among the number all those cited by Mr. Justice Smith) furnishes material for an induction of the rule, and inevitably points to a final generalization, as I have endeavored to make it. Either that is true, or the common-law jurisdiction of the courts to determine the reasonableness of railroad traffic charges must be abandoned as no longer tenable. Every decision cited in the majority opinion, and notably those made by the federal courts, is as-

sertive of the rule that the reasonableness of a carrier's charges in its last analysis is for the courts. These decisions have not been made in controversies between shipper and carrier, nor have they been made in controversies as to the reasonableness of a particular charge, but they have been made in controversies in which the carrier was a party on the one hand and the state a party on the other, and they have been made as to general schedules of traffic rates.   Furthermore, they did not adjudicate as to past transactions.   They adjudicated as to transactions *in futuro*.   They did not merely determine that as to past transactions or past shipments the rates fixed by legislative enactment of the states or commissions authorized by the states were unreasonably low.   They determined that as to future transactions — as to future shipments — the rates so fixed would continue to be unreasonably low so long as the existing circumstances involving the carrier remained the same.   In the case of *Ames v. Union Pac. Ry. Co.*, 64 Fed. (C. C.) 165, it was decided by Mr. Justice Brewer that the traffic rates as fixed by the state of Nebraska were unreasonably low, in view of the then condition of the railroad business in that state, and, hence, that the further enforcement of the legislative schedule should be enjoined; but that jurisdiction of the injunction proceeding would be retained, to the end that, as future traffic might justify, the injunction order could be modified and the reinstatement of the statutory schedule of rates be allowed.   Upon appeal to the supreme court of the United States, it was ruled :

"If the circuit court finds that the present condition of business is such as to admit of the application of the statute to the railroad companies in question without depriving them of just compensation, it will be its duty to discharge the injunction order heretofore

granted, and to make whatever order is necessary to remove any obstruction placed by the decrees in these cases in the way of the enforcement of the statute.'' (*Smyth v. Ames,* 169 U. S. 468, 42 L. Ed. 819.)

It is idle — it is puerile — to talk about the effect of this and other like decrees operating *in præsenti* only, and as to past transactions. They project themselves into the future and were intended to do so. They operate upon things to be apprehended and prevent their occurrence, the same as do all judgments restrictive of future action. The claimed difference between nullifying a schedule of unreasonably low rates without fixing a reasonable one in its stead, and nullifying an unreasonably high one by fixing a reasonable one in its stead will be further noticed presently. Now, decisions like those above noted have held that schedules of rates fixed by or under legislative authority were and would be under prevailing conditions unreasonably low, and they were made in controversies in which the authorized agents of the general public were allowed a standing in court to defend the rates fixed by them.

I demand to know by what reason, in the case of a general schedule of rates fixed by the railroad companies themselves, which the public claim are and will continue to be too high under prevailing conditions, that public may not have a standing in court likewise to adjudicate the question. The business of railroad transportation is of vital public concern. It is clothed with a public interest. It is not *juris privati.* That was decided in the case of *Munn v. Illinois,* 94 U. S. 113, 24 L. Ed. 77, and has been repeated in a multitude of decisions since that one was made. If, in virtue of the private interest which railroad companies have in the maintenance of their right to charge

reasonable tolls, they can compel the state to litigate
with them as to whether the rates fixed by law afford
to them less than a fair compensation, and if, in vir-
tue of that right, they can secure an adjudication of
prospective application in their favor, upon precisely
the same ground ought the state to be allowed to
litigate the public interests of all its citizens against
the private interests of the carrier companies in the
maintenance of an unreasonably high schedule of
rates, and to secure in its favor a like decree of pros-
pective application.

I think the rule of the rightfulness of an interposi-
tion by the state to secure a judicial adjudication of
the reasonableness of a schedule of railroad rates was
broadly intimated by the majority of the judges of
the supreme court of the United States in *Chicago &c.
Railway Co. v. Minnesota*, 134 U. S. 418, 10 Sup. Ct.
462, 702, 33 L. Ed. 970. That was one among the
first of the cases holding that the reasonableness of a
state schedule of railroad rates was in its final aspect
a judicial question for the courts. In the majority
opinion, on page 458, Mr. Justice Blatchford said :

" The question of the reasonableness of a rate of
charge for transportation by a railroad company, in-
volving as it does the element of reasonableness both
as regards the company and as regards the public, is
eminently a question for judicial investigation, re-
quiring due process of law for its determination."

In that case, Mr. Justice Miller, in a concurring
opinion, laid down what he regarded as ten funda-
mental legal propositions, as bases of action by the
courts in adjudicating controversies between railroad
companies and the public over the reasonableness of
traffic charges. The third, fourth, sixth and seventh
of these propositions indicate the views which I think

54—61 KAN.

ought to be and finally will be the controlling ones. They are as follows :

"3. Neither the legislature, nor such commission acting under the authority of the legislature, can establish arbitrarily, and without regard to justice and right, a tariff of rates for such transportation, which is so unreasonable as to practically destroy the value of property of persons engaged in the carrying business on the one hand, *nor so exorbitant and extravagant as to be in utter disregard of the rights of the public for the use of such transportation on the other.*

"4. *In either of these classes of cases there is an ultimate remedy* by the parties aggrieved, in the courts, for relief *against such oppressive legislation,* and especially in the courts of the United States, where the tariff of rates established either by the legislature or by the commission is such as to deprive a party of his property without due process of law."

"6. That the proper, if not the only, mode of judicial relief against the tariff of rates established by the legislature, or by its commission, is by a bill in chancery asserting its unreasonable character and its conflict with the constitution of the United States, *and asking a decree of court forbidding the corporation from exacting such fare as excessive, or establishing its right to collect the rates as being within the limits of a just compensation for the service rendered.*

"7. *That until this is done it is not competent for each individual having dealings with the carrying corporation,* or for the corporation with regard to each individual who demands its services, *to raise a contest in the courts over the questions which ought to be settled in this general and conclusive method.*"

The italics in the above quotations are mine. I know it does not well establish the soundness of a legal opinion to rest it upon isolated quotations from the argumentative writings of the judges, and I do not propose to do much in that way. My associates have done quite enough of it in their opinion. How-

ever, when a rule of law is in its formative stage we may well look to such character of expressions and even to the *dicta* of the judges for light and guidance. But we are not left to the chance and casual thought of the courts upon the question for clear indications of the governing rule. Decisions quite clearly indicative of what the rule is or ought to be have been made. An act of congress approved June 30, 1870, authorized the construction and maintenance of a bridge over the Niagara river by the International Bridge Company, and it provided, among other things :

"All railway companies desiring to use said bridge shall have and be entitled to equal rights and privileges in the passage of the same and in the use of the machinery and fixtures thereof and of all the approaches thereto, under and upon such terms and conditions as shall be prescribed by the district court of the United States for the northern district of New York, upon hearing the allegations and proofs of the parties, in case they shall not agree."

The bridge company and the railroad companies using the bridge could not agree, and the court was called upon, according to the act of congress, to determine the terms and conditions of equality of right and privilege in the companies to the use of the bridge, and the terms and conditions upon which, as to the bridge company, the railroad companies were entitled to use the structure. The case is so nearly like the one before us, and the decision of the court so nearly sustains the rule we contend for, that I quote the syllabus and a large portion of the opinion.

"A determination by a court, under the authority of a statutory enactment, in a case of disagreement, of the ' terms and conditions ' upon which a railway company should be entitled to the use of a bridge and its appurtenances, after hea ·ing the allegations and

proofs of the parties, is not an improper exercise of the judicial function.

"2. It is no less the exercise of a judicial function to prescribe a rule of conduct, or protect the existence of a right during a future period, than it is to determine whether the right has been invaded in the past.

"3. When a statute refers the question of the conditions upon which an easement shall be enjoyed to a judicial tribunal for decision, after hearing the proofs and allegations of the parties, the implication is cogent that the decision shall proceed upon settled principles of law and equity, and not upon arbitrary discretion."

"By the act in question congress gave its sanction in advance, but upon the conditions that all railway companies desiring to use the bridge should have equal rights and privileges in the passage and in the use of the bridge, and of the machinery, fixtures, and approaches, 'under and upon such terms and conditions' as this court should prescribe, 'upon hearing the proofs and allegations of the parties in case they should not agree.' The power of congress over the subject was plenary. It exercised the power, and the International Bridge Company availed itself of the privileges and assented to the conditions of the legislative sanction. Congress could not delegate its legislative power to any authority, nor could it confer jurisdiction upon this court to exercise any but judicial functions; and if the act in question, in any of its provisions, contravenes these maxims of constitutional law as to those provisions, it is inoperative. But the act is not obnoxious to these objections. It devolves upon this court simply the judicial functions of determining the rights of parties when they may be brought into controversy.

"The rights are created and established by the act; and this is the office of the legislative department. The power to adjudicate upon these rights, to ascertain, when controversy arises, their extent and value, and apply the appropriate remedy for their protection, is conferred upon the court; and this is the peculiar province of the judicial department.

" It is argued that the act attempts to confer upon the court the power to fix the rate of tolls which the International Bridge Company may charge, and that this is a legislative and not a judicial function.   If congress had fixed the rate of tolls, as it had the right to prescribe the conditions upon which the franchise might be enjoyed, no other authority could have intervened to change these conditions.   But suppose the act had, in terms, provided that the bridge company might charge reasonable tolls, would not this have been a complete exercise of the legislative power, and would it not have remained for the judicial department to decide, when controversy should arise, what were or were not reasonable tolls?   And if the act had provided for such a determination by a judicial tribunal, would this have been unconstitutional?   It seems to me clearly not.   It is no less the exercise of judicial functions to prescribe a rule of conduct or protect the existence of a right during a future period, than it is to determine whether the right has been invaded in the past.   It is one of the common offices of a court of equity to do this."   (*In re Canada Northern Ry. and others*, 7 Fed. 653.)

It is not true, as the above-cited cases and others bearing more or less directly upon the question evidence, that judicial action is confined to things *in præsenti*, and cannot be made determinable of controversies to arise in the future, when the nature of he controversies can be known beforehand and provision for their settlement can be made in advance; nor is it true that the courts cannot exercise what is called administrative power.   Administrative power, as well as I can define it, when exercised in respect to matters of public interest, is a *quasi*-judicial power of discretionary control to effectuate a rule of legal policy.   This definition is not entirely accurate or exact.   It will suffice, however, as I believe, to comprehend in general outline cases of public concern in

which the power called administrative is exerted. Such kind of power is in constant use by the equity courts. There is not a power conferred by the court of visitation act but what is of frequent exercise by the courts in railway mortgage-foreclosure cases. While no cases of the promulgation of schedules of traffic rates by courts in the foreclosure of railway mortgages have come under my observation, it cannot be doubted, I think, that the judges in such cases have an unquestioned right to make, and through their receivers to enforce, a schedule of rates over the lines subject to their control. They have done what in principle is the same thing.

In the cases of *Waterhouse v. Comer*, 55 Fed. 149, and *Ames v. Union Pac. Ry. Co.* 62 Fed. 7, it was ruled that the courts had power in railway-foreclosure cases to control their receivers as to wages paid the employees operating the lines, and to that end to annul schedules of wages promulgated by the receivers and at one time approved by the court, and to restore former schedules of wages. In the case of *The Mercantile Trust Co. v. The Farmers' Loan & Trust Co.*, 81 Fed. 254, 26 C. C. A. 383, it was said by the United States circuit court of appeals that courts of equity were charged with the performance of some duties that were administrative rather than judicial in their nature ; as, for instance, whether the receiver operating a railway under process of mortgage foreclosure should renounce or adopt a contract of lease of another railway which the mortgagor company had made before the foreclosure proceeding began. As to the question involved in the case the court tersely stated its character, as follows : "The issue in the court below presented a question of business policy, and not a question of law. The decision and order of the court were administrative, rather than judicial."

The State v. Johnson.

It is no answer to say that there is a difference between the powers of a court charged with the judicial administration of a trust, as in a foreclosure case, and its powers in other cases over which it has jurisdiction. The obligation of courts to assist in the collection of debts in mortgage-forclosure cases does not justify the exercise of any powers which may not be employed in the interest of litigants in other classes of cases. The law is the same to all suitors.   It may be admitted that the traditional jurisdiction of courts of equity does not include the power to decree a schedule of traffic rates except to the specific end of raising revenue from the tolls with which to discharge a creditor's lien ; but the legislature, as I contend, may confer jurisdiction upon it to do so for other purposes or in the interest of other parties.

It is said that there is a difference between nullifying a schedule of unreasonable rates and decreeing a schedule of rates to be reasonable.   I claim that there is no difference.   When a court judicially declares that a schedule of traffic rates is unreasonably low, and therefore relieves the company from the obligation to limit its charges thereby, it at the very same time, in effect at least, decrees another schedule of rates in its stead. It decrees a schedule of reasonable rates.   The common law required rates to be reasonable, and when the court adjudges the legislative schedule to be unreasonable it does but decree the enforcement of the common-law schedule in its stead.   It does not at the time determine what is reasonable.   It leaves that to future determination.   Heretofore it had been left to ascertainment in isolated and particular cases.   That method is no longer practicable, as I think has been hereinbefore shown.   No one, as before remarked, undertakes to resort to it and no court will now pro-

tend that the remedy is practicable or adequate.   That the law should afford to railroad companies a remedy in the courts against an unreasonably low schedule of rates, and the right to adjudicate it as a whole, in a single controversy, but at the same time deny to the shipping public the right to abate as a whole and in a single controversy an unreasonably high schedule fixed by the company itself, would be a reproach to the administration of justice and an outrage upon common right.   Whether the power in the courts to adjudicate the question of traffic rates be called judicial or administrative, it exists, in my judgment.

I close with the following quotation from a recent and most philosophic and valuable work· entitled "Comparative Administrative Law," by Goodnow, volume 1, page 29 :

"Athough the general rule may be that the courts shall be confined in the main to the decision of controversies between individuals, nevertheless in many instances the needs of government make it seem advisable to entrust the courts with functions somewhat administrative in character.   While this may be said of all states, it is especially true of those which have not really striven in their law to reach any clear distinction between judicial and administrative functions. Thus in the commonwealths of the United States and England where the exceptions to the logical adoption and application of the theory of the separation of powers are numerous, judicial officers from time immemorial have been entrusted with the discharge of executive or administrative functions."

I think there are no sufficient reasons for annulling the statute, as has been done by my associates in their decision.